Filed 12/21/21; Certified for Publication 1/12/22 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| WESTERN GROWERS ASSOCIATION et al., | |
|     Plaintiffs and Appellants, | A162343 |
| v. | |
| OCCUPATIONAL SAFETY AND HEALTH STANDARDS BOARD et al., | (San Francisco City & County Super. Ct. No. CPF21517344) |
|     Defendants and Respondents. | |

Western Growers Association, California Farm Bureau Federation, California Business Roundtable, Grower-Shipper Association of Central California, California Association of Winegrape Growers, and Ventura County Agricultural Association (appellants) challenged the emergency temporary standards (ETS) promulgated by the California Occupational Safety and Health Standards Board (Board) in response to the COVID-19 pandemic. After filing suit, appellants sought a preliminary injunction suspending enforcement of the ETS. The trial court denied the request, concluding appellants had not shown a likelihood of prevailing on the merits and finding the public interest in curbing the spread of COVID-19 weighed "heavily" in favor of ongoing enforcement of the ETS. On appeal, appellants contend the trial court erroneously applied a deferential standard of review,

the findings of emergency (FOE) lacked necessary findings, and the ETS exceeded the Board's statutory authority. We affirm the order.[1]

## I. BACKGROUND

### A. *Factual Background*

On March 4, 2020, Governor Newsom declared a "State of Emergency" in response to the COVID-19 pandemic and, shortly thereafter, issued a stay-at-home order that indefinitely required all individuals to remain at home. The federal government identified 16 sectors as "vital to the United States," and California exempted workers in those sectors from the stay-at-home order. Different state agencies promulgated various COVID-19-related guidance documents for essential businesses. For example, the Department of Housing and Community Development "encouraged" contractors to take certain steps for their migrant farmworker centers, such as social distancing, providing personal protective equipment (PPE), and access to hand sanitizers. Businesses also operated under injury and illness prevention

---

[1] On May 25, 2021, respondents the Board, David Thomas, Chris Laszcz-Davis, Laura Stock, Barbara Burgel, David Harrison, and Nola J. Kennedy, in their official capacities as members of the Board, Christina Shupe, in her official capacity as executive officer of the Board, the Division of Occupational Safety and Health (hereafter Cal/OSHA), and Douglas L. Parker, in his official capacity as chief of Cal/OSHA (jointly, respondents) filed a request for judicial notice of proposed changes that would become part of a readopted ETS, and a Cal/OSHA update relating to the COVID-19 ETS. Appellants opposed the request. We deny the request because these materials are "not relevant to disposition of this appeal." (*Unzueta v. Akopyan* (2019) 42 Cal.App.5th 199, 221, fn. 13.)

On August 30, 2021, respondents filed a motion to dismiss the appeal on the ground that the Board's adoption of a revised ETS mooted the appeal, along with a related request for judicial notice of various documents associated with the revised ETS. In light of the holdings in this opinion, we deny respondents' motion and associated request for judicial notice.

programs (IIPP's), which required employers to "establish, implement and maintain" programs to "ensur[e] that employees comply with safe and healthy work practices." (Cal. Code Regs., tit. 8, § 3203, subd. (a).)

On May 20, 2020, the Labor & Employment Committee of the National Lawyers Guild and Worksafe submitted a petition to the Board, requesting the Board promulgate emergency temporary standards addressing workplace safety issues specifically related to COVID-19. The petition asserted an emergency temporary standard was necessary to protect the lives of employees who may be exposed to COVID-19 in the course of their employment and subsequently expose the communities in which they live. The petition further claimed the existing regulations "have not been adequate" to protect workers and proposed a hybrid performance-based and specification-based standard.

On July 30, 2020, the chief of Cal/OSHA issued a memorandum recommending the Board adopt a COVID-19-specific emergency regulation for " 'Non-5199 Workers.' "[2] In doing so, Cal/OSHA identified various existing regulations under title 8 of the California Code of Regulations (Title 8 regulations) that "require protections against COVID-19," but noted the regulations "are not specific to this virus and generally do not identify the particular measures or controls that employers must take to prevent workplace spread of COVID-19." Cal/OSHA concluded a specific set of COVID-19 regulations "will enhance Cal/OSHA's ability to protect workers" by strengthening "regulatory mandates specific to preventing the spread of

---

[2] Cal/OSHA's "Aerosol Transmissible Diseases" (ATD) standard (Cal. Code Regs., tit. 8, § 5199) (Regulation 5199) applies to viruses such as COVID-19, but is limited to only certain employers, such as medical services and facilities, certain laboratories, correctional facilities, homeless shelters, and drug treatment programs.

3

infectious diseases" and "provid[ing] clear instructions to employers and employees . . . , eliminating any confusion and enhancing compliance."

On August 10, 2020, a Board staff evaluation was completed for the petition. It noted Cal/OSHA's webpage for COVID-19 guidance to employers states: "Workplace safety and health regulations in California require employers to take steps to protect workers exposed to infectious diseases like the Novel Coronavirus (COVID-19), which is widespread in the community." The evaluation further noted Cal/OSHA "is enforcing existing COVID-19 protections and providing consultative outreach to employers with exposed employees. Board staff is unable to find evidence that the vast majority of California workplaces are not already in compliance with COVID-19 requirements and guidelines." As a result, the evaluation cautioned against a new regulation and opined, "Cal/OSHA's limited resources should continue to be focused on enforcement and consultation outreach specifically targeted at employers and sectors of the economy with deficient COVID-19 protections, as this is more likely to be effective at ensuring employee protections." The evaluation also expressed concern that conflicts may arise between the IIPP and existing guidelines regarding COVID-19.

The Board staff ultimately concluded "while the risk of exposure to SARS-CoV-2 is significant, new regulations . . . are not likely to significantly improve employee outcomes." Accordingly, the Board staff recommended the petition be denied.

At its September 17, 2020 meeting, the Board voted to adopt an emergency temporary standard related to COVID-19.

On November 12, 2020, the Board made public its "Notice of Proposed Emergency Action," which included the proposed ETS and the FOE. The proposed ETS set forth various requirements for (1) communicating with

4

employees about COVID-19; (2) identifying and evaluating COVID-19 hazards; (3) investigating and responding to COVID-19 cases in the workplace, including providing COVID-19 testing to exposed employees; (4) correcting any COVID-19 hazards; (5) providing training and instruction regarding COVID-19 and related policies and procedures; (6) implementing various guidelines regarding physical distancing, face coverings, and other engineering controls, administrative controls, and personal protective equipment; (7) reporting and recordkeeping; and (8) excluding COVID-19 cases to limit transmission in the workplace and establishing return-to-work criteria. The proposed ETS also set forth regulations for addressing multiple COVID-19 infections and COVID-19 outbreaks, as well as COVID-19 prevention in employer-provided housing and transportation.

The FOE stated: "The objective of the proposed emergency standard is to reduce employee exposure to the virus that causes COVID-19 and therefore reduce COVID-19 illness and transmission." It further stated the Board "finds that immediate action must be taken to avoid serious harm to the public peace, safety, or general welfare," and set forth 20 supporting reasons. Those reasons included the "acute and chronic adverse health effects" posed by COVID-19, the inability to timely address such risks through regular rulemaking, the concern that "the majority of California workers are not covered by the protections afforded by [Regulation] 5199," the significant number of complaints received by Cal/OSHA "alleging inadequate protections for and potential exposure to COVID-19 in workplaces," and the inconsistent guidance between federal and state agencies and the benefit of "a specific set of regulations related to COVID-19 prevention in all workplaces." The FOE emphasized the ETS "would significantly reduce the number [of] COVID-19 related illnesses, disabilities

5

and deaths in California's workforce" and "is necessary to strengthen [Cal/OSHA's] enforcement efforts related to the hazard of COVID-19 in workplaces."  It explained, "Current regulations are not sufficiently specific as to what employers are required to do during the COVID-19 pandemic.  This results in confusion on behalf of both employers and employees, leaving many employees unprotected. [¶] This confusion also causes [Cal/OSHA] to expend staff resources to respond to questions that would be answered by [the ETS]."

In response, the Board received comments in support of and opposition to the ETS.  The Board unanimously adopted the proposed ETS and FOE, with the ETS becoming effective on November 30, 2020.

The Office of Administrative Law (OAL) reviewed the rulemaking file and identified "potential issues with information contain[ed] in the Board's [FOE]."  The OAL requested the Board address these issues in an addendum, which was subsequently prepared and submitted to the OAL.  The addendum "further addresse[d] the facts leading to the emergency rulemaking effort and the necessity for COVID-19 specific emergency regulations."

## B. Procedural History

In response to the ETS, appellants filed a verified petition and complaint alleging eight causes of action:  (1) declaratory relief; (2) writ of traditional mandate; (3) violations of the California Occupational Safety and Health Act of 1973 (Lab. Code, § 6300 et seq.); (4) violations of the California Administrative Procedure Act (Gov. Code, § 11340 et seq.); (5) violations of Bagley-Keene Open Meeting Act (Gov. Code, § 11120 et seq.); and (6) violation of due process.  Appellants asserted the ETS "exceed[ed] the authority of the Board and undermine[d] existing laws, regulations, and enforceable guidance intended to prevent or slow the spread of COVID-19 in

6

the workplace." Appellants sought injunctive and declaratory relief, as well as the issuance of a peremptory writ of mandate.

Appellants subsequently moved for a preliminary injunction. They argued the Board failed to follow the necessary procedures for emergency rulemaking, including that the ETS exceeded the Board's statutory authority by adopting the amendment to the FOE, the ETS's presumptions exceeded Cal/OSHA's authority, and the ETS violated due process by failing to provide employers with any mechanism to obtain an exemption. Appellants further asserted the balance of equities favored a preliminary injunction as the preexisting regulatory framework provided adequate protection pending trial, employers faced a real threat of imminent and irreparable harm to their businesses under the ETS, and there was no adequate remedy at law.

Respondents opposed the application. They asserted appellants had not demonstrated a likelihood of success on their claims and the balance of equities favored maintaining the ETS. Respondents argued the harm to businesses asserted by appellants was speculative, whereas "[t]he public has a strong interest in reducing or stopping the spread of COVID-19 in workplaces . . . ."

The trial court denied appellants' application for a preliminary injunction. The court concluded appellants had not shown a likelihood of prevailing on the merits of their claims. It further noted "the balance of interim harms and the public interest in curbing the spread of COVID-19 and protecting worker and community health weigh heavily in favor of the continued implementation and enforcement of the ETS Regulations. With the single exception of restrictions on attendance at religious services, which present unique constitutional considerations, no federal or state court in the country has blocked emergency public health orders intended to curb the

7

spread of COVID-19, and the illnesses, hospitalizations, and deaths that follow in its wake. . . . This Court will not be the first.  Lives are at stake."  Appellants timely appealed.

## II.  DISCUSSION

Appellants contend the trial court erred by reviewing the Board's adoption of the FOE and ETS under an abuse of discretion standard rather than applying de novo review.  They also raise various challenges to the adequacy and legality of the FOE and ETS.  We address each argument in turn.

### A.  *Standard of Review*

In determining whether to issue a preliminary injunction, the trial court considers two related factors:  (1) the likelihood that the plaintiff will prevail on the merits of its case at trial, and (2) the interim harm that the plaintiff is likely to sustain if the injunction is denied as compared to the harm that the defendant is likely to suffer if the court grants a preliminary injunction.  (*14859 Moorpark Homeowner's Assn. v. VRT Corp*. (1998) 63 Cal.App.4th 1396, 1402 (*Moorpark*).)  " 'The latter factor involves consideration of such things as the inadequacy of other remedies, the degree of irreparable harm, and the necessity of preserving the status quo.' "  (*Ibid*., quoting *Abrams v. St. John's Hospital & Health Center* (1994) 25 Cal.App.4th 628, 636.)  The determination of whether to grant a preliminary injunction generally rests in the sound discretion of the trial court.  (*Moorpark*, at p. 1402.)  Discretion is abused when a court exceeds the bounds of reason or contravenes uncontradicted evidence.  (*Ibid*.)  "[W]ith respect to questions of construction of statutes and contracts not involving assessment of extrinsic evidence, our standard of review is de novo."  (*Davenport v. Blue Cross of California* (1997) 52 Cal.App.4th 435, 445 (*Davenport*).)  " ' "[W]hen reviewing

the interpretation and application of a statute where the ultimate facts are undisputed" ' an appellate court exercises its independent judgment in determining whether issuance or denial of injunctive relief was proper." (*City of Vallejo v. NCORP4, Inc.* (2017) 15 Cal.App.5th 1078, 1085.)

The court properly exercises its discretion where its determination is supported by substantial evidence. (*Monogram Industries, Inc. v. Sar Industries, Inc.* (1976) 64 Cal.App.3d 692, 703.) " 'Where the evidence before the trial court was in conflict, we do not reweigh it or determine the credibility of witnesses on appeal. "[T]he trial court is the judge of the credibility of the affidavits filed in support of the application for preliminary injunction and it is that court's province to resolve conflicts." [Citation.] Our task is to ensure that the trial court's factual determinations, whether express or implied, are supported by substantial evidence. [Citation.] Thus, we interpret the facts in the light most favorable to the prevailing party and indulge in all reasonable inferences in support of the trial court's order.' " (*Alliant Ins. Services, Inc. v. Gaddy* (2008) 159 Cal.App.4th 1292, 1300; see *Moorpark, supra*, 63 Cal.App.4th at pp. 1402–1403 [reviewing court will presume the trial court made appropriate factual findings in the absence of express findings and review the record for substantial evidence to support the rulings].)

## B. *The Administrative Procedure Act*

### 1. *Emergency Regulations*

Before promulgating a regulation, the Administrative Procedure Act (Gov. Code,[3] § 11340 et seq.; APA) generally requires a state agency provide a 45-day public notice and written comment period, followed by a public

---

[3] All further statutory references are to the Government Code unless otherwise noted.

9

hearing.  (§ 11346.4.)  In an "emergency," however, the agency can shorten the public notice and written comment period to five days.  (§ 11346.1, subd. (a)(2).)  The APA defines " '[e]mergency' " as "a situation that calls for immediate action to avoid serious harm to the public peace, health, safety, or general welfare."  (§ 11342.545.)

To promulgate an emergency regulation, a state agency is required to find "the adoption of a regulation . . . is necessary to address an emergency . . . ."  (§ 11346.1, subd. (b)(1).)  The state agency also must provide a written statement that includes "a written statement that contains the information required by paragraphs (2) to (6), inclusive, of subdivision (a) of Section 11346.5 and a description of the specific facts demonstrating the existence of an emergency and the need for immediate action, and demonstrating, by substantial evidence, the need for the proposed regulation to effectuate the statute being implemented, interpreted, or made specific and to address only the demonstrated emergency."  (§ 11346.1, subd. (b)(2).)

Section 11346.1, subdivision (b)(2) further provides:  "A finding of emergency based only upon expediency, convenience, best interest, general public need, or speculation, shall not be adequate to demonstrate the existence of an emergency.  If the situation identified in the finding of emergency existed and was known by the agency adopting the emergency regulation in sufficient time to have been addressed through nonemergency regulations adopted in accordance with the provisions of Article 5 (commencing with Section 11346), the finding of emergency shall include facts explaining the failure to address the situation through nonemergency regulations."

## 2. *Review of Agency Actions*

### a. Generally

In reviewing quasi-legislative agency actions, such as the Board's adoption of the ETS, we apply the following standard of review: " ' " [I]n reviewing the legality of a regulation adopted pursuant to a delegation of legislative power, the judicial function is limited to determining whether the regulation (1) is "within the scope of the authority conferred" [citation] and (2) is "reasonably necessary to effectuate the purpose of the statute" [citation].' [Citation.] 'These issues do not present a matter for the independent judgment of an appellate tribunal; rather, both come to this court freighted with [a] strong presumption of regularity . . . .' [Citation.] Our inquiry necessarily is confined to the question whether the classification is 'arbitrary, capricious or [without] reasonable or rational basis.' [Citations.]" ' [Citations.] Of all administrative decisions, quasi-legislative acts receive the most deferential level of judicial scrutiny. [Citations.] . . . Civil statutes enacted to protect the public are generally broadly or liberally applied in favor of that protective purpose. [Citations.]

"But we conduct independent review of whether defendants have exceeded the scope of authority delegated by the Legislature to them or the meaning of a statute. [Citations.] Deference is not accorded to an administrative action which is incorrect in light of unambiguous statutory language or which is clearly erroneous or unauthorized. [Citations.] Nor can we, in construing a remedial statute liberally, apply it in a manner not reasonably supported by its statutory language." (*Southern California Gas Co. v. South Coast Air Quality Management Dist.* (2011) 200 Cal.App.4th 251, 267–268.)

11

### b. Emergency regulations

As to emergency regulations, appellants contend whether an emergency exists is a question regarding the scope of authority delegated by the Legislature, and thus must be reviewed de novo.

Courts traditionally have held " '[w]hat constitutes an emergency is primarily a matter for the agency's discretion.' " (*Doe v. Wilson* (1997) 57 Cal.App.4th 296, 306, quoting *Schenley Affiliated Brands Corp. v. Kirby* (1971) 21 Cal.App.3d 177, 194–195 (*Schenley*).) In *Doe v. Wilson*, our colleagues in Division Five addressed emergency regulations issued in response to then-recently enacted federal legislation. (*Doe v. Wilson*, at p. 299.) The court noted, "Under *Schenley*, a court is not necessarily bound by an agency's determination of the existence of an emergency, but the court must accord *substantial deference* to this agency finding, and may only overturn such an emergency finding if it constitutes an abuse of discretion by the agency." (*Id.* at p. 306.) The court upheld the emergency regulations, concluding "appellants properly exercised the discretion confided in them by law under *Schenley* when they determined [recent federal law], which made California's ongoing program of paying for routine prenatal care for illegal aliens illegal under federal law, was 'an unforeseen situation calling for immediate action.' "[4] (*Doe v. Wilson*, at p. 306.)

Appellants contend Assembly Bill No. 1302 (2005–2006 Reg. Sess.) (Assembly Bill 1302), which amended section 11346.1, subdivision (b)(2) in

---

[4] Appellants argue *Schenley* is no longer valid authority. We agree *Schenley* is no longer good law as to the definition of an emergency (see, e.g., § 11342.545 [defining emergency]; Asimow et al., Cal. Practice Guide: Administrative Law (The Rutter Group 2021) ¶ 26:159), but that issue is distinct from the proper standard of review. We are unaware of any case law disputing its description of the proper standard of review for emergency regulations.

2007, altered the deferential standard of review set forth in *Schenley*. As noted by appellants, the 2007 amendment to section 11346.1 sought to strengthen and clarify the standard for when emergency regulations are appropriate "both by amending the standard itself and by specifying what an agency must show in its finding of emergency." (Assem. Concur. in Sen. Amend. of Assem. Bill 1302, as amended Aug. 23, 2006, p. 3.) Assembly Bill 1302 "amend[ed] the standard" by adopting section 11342.545, which provided a definition of "emergency." The bill also clarified the showing for a finding of emergency by supplementing section 11346.1, subdivision (b). Former section 11346.1, subdivision (b), required in relevant part, "Any finding of an emergency shall include a written statement which contains the information required by paragraphs (2) to (6), inclusive, of subdivision (a) of Section 11346.5 and a description of the specific facts showing the need for immediate action." (Stats. 2000, ch. 1060, § 21.) The revised provision now requires, "Any finding of an emergency shall include a written statement that contains the information required by paragraphs (2) to (6), inclusive, of subdivision (a) of Section 11346.5 and a description of the specific facts demonstrating the existence of an emergency and the need for immediate action, and demonstrating, by substantial evidence, the need for the proposed regulation to effectuate the statute being implemented, interpreted, or made specific and to address only the demonstrated emergency." (§ 11346.1, subd. (b)(2).)

Appellants assert the first phrase of section 11346.1, subdivision (b)(2), which in part requires "a description of the specific facts demonstrating the existence of an emergency and the need for immediate action," corresponds to " 'determining whether the regulation is within the scope of the authority delegated by the Legislature.' " (See *Yamaha Corp. of America v. State Bd. of*

13

*Equalization* (1998) 19 Cal.4th 1, 11 (*Yamaha*).) And "[a] court does not . . . defer to an agency's view when deciding whether a regulation lies within the scope of the authority delegated by the Legislature." (*Id.* at p. 11, fn. 4.) Appellants then argue the second phrase of section 11364.1, subdivision (b)(2), which requires the agency demonstrate "by substantial evidence, the need for the proposed regulation to effectuate the statute being implemented, interpreted, or made specific and to address only the demonstrated emergency," corresponds to whether the regulation is " 'reasonably necessary to effectuate the purpose of the statute.' " (*Yamaha*, at p. 11.) That assessment, based on the "substantial evidence" language, is subject to deferential review. (See *ibid.* & § 11364.1, subd. (b)(2).)

Appellants' argument blends the issue of the legal conclusion of emergency with the Board's factual findings and expert judgments underlying its finding of emergency. " '[A]gencies are normally not empowered to determine, in an authoritative way, the decision-making criteria that relevant statutes require them to consider when they formulate and adopt rules. As a result, courts must review wholly de novo the propriety of the decision-making criteria utilized by agencies when they make rules.' " (*California Advocates for Nursing Home Reform v. Bontá* (2003) 106 Cal.App.4th 498, 506.) Conversely, "[a] reviewing court will not substitute its policy judgment for the agency's in the absence of an arbitrary decision." (*Western Oil & Gas Assn. v. Air Resources Board* (1984) 37 Cal.3d 502, 509.)

The Board's underlying assessment regarding whether the existing Title 8 regulations sufficiently protected workers from the COVID-19 pandemic is a "substantive policy decision[ ] in its area of expertise." (See *California Advocates for Nursing Home Reform v. Bontá*, *supra*,

106 Cal.App.4th at p. 506.) It also falls within the provision of section 11346.1, subdivision (b)(2) requiring that the Board demonstrate "by substantial evidence, the need for the proposed regulation to effectuate the statute being implemented." Accordingly, those factual findings are entitled to deference. And in considering the description of these factual findings, we then independently assess whether the Board properly made a finding of emergency.[5]

We note nothing in the legislative history of Assembly Bill 1302 or in subsequent case law indicates an intent to apply de novo review to the entire finding of emergency—i.e., the conclusion of an emergency and the factual findings underlying that conclusion. Moreover, " ' "[a] statute is not to be read in isolation; it must be construed with related statutes and considered in the context of the statutory framework as a whole. [Citation.]" ' [Citation.] This exercise is designed to allow statutes to 'be harmonized, both internally and with each other.' " (*Asfaw v. Woldberhan* (2007) 147 Cal.App.4th 1407, 1421.) Section 50 of title 1 of the California Code of Regulations sets forth the special requirements for submission of emergency regulatory actions. Specifically, it requires agencies enacting emergency regulations to provide a

---

[5] Appellants cite an OAL opinion, "Decision of Disapproval of Emergency Regulatory Action," OAL file No. 07-0119-02 E, to argue for de novo review. While that opinion does state, "Neither OAL nor the courts are required to defer to the judgment of the agency in the determination of whether an emergency exists," it does not clarify whether it is referencing the legal conclusion of emergency or the underlying factual findings. (OAL file No. 07-0119-02 E, at p. 4.) However, we note that opinion cites *Doe v. Wilson*, *supra*, 57 Cal.App.4th 296, with approval. (OAL file No. 07-0119-02 E, at pp. 4–6.) Appellants also cite *Sorenson Communications Inc. v. F.C.C.* (D.C. Cir. 2014) 755 F.3d 702 in support of their position. While that court applied de novo review of the "agency's legal conclusion of good cause," it "defer[red] to an agency's factual findings and expert judgments therefrom, unless such findings and judgments are arbitrary and capricious." (*Id.* at p. 706 & fn. 3.)

15

statement "confirming that the emergency situation addressed by the regulations clearly poses such an immediate, serious harm that delaying action to allow notice and public comment would be inconsistent with the public interest. The statement shall include: [¶] 1. Specific facts demonstrating by *substantial evidence* that failure of the rulemaking agency to adopt the regulation within the time periods required for notice . . . and for public comment . . . will likely result in serious harm to the public peace, health, safety, or general welfare; and [¶] 2. Specific facts demonstrating by *substantial evidence* that the immediate adoption of the proposed regulation by the rulemaking agency can be reasonably expected to prevent or significantly alleviate that serious harm." (Cal. Code Regs., tit. 1, § 50, subd. (b)(3)(B), italics added.) The Code of Regulations thus supports our interpretation that the underlying factual findings regarding imminent harm are entitled to deferential review. (Accord *Brutoco Engineering & Construction, Inc. v. Superior Court* (2003) 107 Cal.App.4th 1326, 1334 ["we do not assume that the Legislature would deliberately adopt a regulation which conflicted with the statute and thus be invalid. [Citations.] We therefore incline towards an interpretation not in conflict with the statute."].) In considering these findings, we then determine whether they demonstrate an emergency.[6]

## C. *Likelihood of Success on the Merits*

Appellants raise various challenges to both the FOE and ETS. Regarding the FOE, appellants argue it does not contain " 'specific facts demonstrating the existence of an emergency and the need for immediate

---

[6] While this standard varies in part from that applied by the trial court, we find the error harmless because, as explained below, we conclude the factual findings support a finding of emergency. (See part II.C., *post*.)

action,' " and fails to justify the alleged delay in enacting the ETS. Appellants further contend the ETS exceeds the Board's statutory authority. We disagree.

## 1. *The FOE*

### a. Findings demonstrating the existence of an emergency and the need for immediate action

Appellants' verified complaint concedes that "no one doubts that the COVID-19 pandemic constitutes a public health emergency." Rather, their arguments focus on whether the pandemic required an immediate need for additional regulation.[7] Specifically, appellants assert the Board failed to show the Title 8 regulations were insufficient to protect workers from COVID-19 and resulting workplace infections. Appellants argue the evidence demonstrates Cal/OSHA was successfully conducting investigations and issuing citations related to COVID-19 under the then-existing Title 8 regulations.

The FOE sets forth specific facts indicating a serious risk of harm posed by COVID-19. It identifies the significant health risks—such as difficulty breathing, organ failure, damage to the lungs, heart and brain, long-term health problems, and death—posed by the virus to certain individuals. It further identified the increased risk of exposure to COVID-19 for those employees " 'who report to their places of employment,' " particularly with regard to migrant temporary farmworkers. The FOE noted "[t]here has been an overrepresentation of migrant temporary farmworkers testing positive for

---

[7] While appellants frame their argument as challenging both the existence of an emergency and the need for immediate action, those two issues are intrinsically linked because an " 'Emergency' " is defined as "a situation *that calls for immediate action* to avoid serious harm to the public peace, health, safety, or general welfare." (§ 11342.545, italics added.)

COVID-19 in California compared to workers in any other industry." The FOE explained such workers often "live in compact, dorm-like housing facilities provided by employers" and, at one such housing facility, 190 of the 216 workers tested returned positive tests. Both the federal Occupational Safety and Health Administration (OSHA) and the Centers for Disease Control (CDC) found the need to issue guidance specifically aimed at workers residing in communal living arrangements and traveling in shared motor vehicles.

The FOE further noted the risk posed by the COVID-19 pandemic was not abating. The FOE stated that, as of October 2020, the majority of Californians were "allowed to engage in on-site work operations" and risked employment-related COVID-19 exposure. The FOE also recounted "[c]lusters and outbreaks of COVID-19 have occurred in workplaces throughout California," and Cal/OSHA "received over 6,937 complaints alleging inadequate protections for and potential exposure to COVID-19 in workplaces."

Likewise, the FOE set forth facts stating the need for immediate action in response to the ongoing threat posed by COVID-19. It explained while "[Regulation] 5199[ ] provides important protections to workers in specified work settings from exposure to novel pathogens, including COVID-19, . . . . the scope of [Regulation] 5199 is limited. Thus, the majority of California workers are not covered by the protections afforded by [Regulation] 5199." The FOE further explained while Title 8 regulations "protect works from hazards in general . . . . there is currently no specific regulation that protects all workers from exposure to infectious diseases such as COVID-19." Accordingly, the FOE concluded emergency regulations were required to "preserve worker safety and health," "combat the spread of COVID-19 in

18

California workers," and "strengthen [Cal/OSHA's] enforcement efforts related to the hazard of COVID-19 in workplaces."  It notes, as of September 30, 2020, the California Department of Public Health (CDPH) "was aware of nearly 400 COVID-19 outbreaks in settings in California that were not covered by existing [Regulation] 5199," which "is likely an undercount, since CDPH relied on reporting from other entities, including heavily burdened local health departments, and the fact that employers in some counties were not obligated to report outbreaks to their local health department until September 18, 2020."

In the section entitled, "Policy Statement and Anticipated Benefits," the FOE explained "COVID-19 continues to infect workers" and "the proposed regulation will reduce the number of COVID-19 infections in the workplace," which will thus "reduce the financial costs caused by medical care and lost workdays, costs that may be borne by employees, their families, employers, insurers, and public benefits programs."  It further noted "[c]urrent regulations are not sufficiently specific as to what employers are required to do during the COVID-19 pandemic[,] . . . leaving many employees unprotected."  The FOE noted the challenge in controlling the spread of COVID-19 because "[a] person who is infected with COVID-19 may have no obvious symptoms, or no symptoms at all, yet still be infectious to others. Therefore, the proposed regulations require . . . employers to implement multiple methods of protections from exposure to COVID-19 at its workplace."  (Fn. omitted.)

These findings outline both the emergency and the need for immediate action.  They identify serious health risks to the public, the scope of the ongoing COVID-19 pandemic, the increased risk of workplace transmission,

and the workplace-related outbreaks that have arisen despite the existing Title 8 regulations.

Appellants argue the FOE failed to show existing regulations were insufficient to address the COVID-19 pandemic or impaired enforcement efforts related to the pandemic. To the contrary, the FOE explained current regulations lacked certain protections. For example, existing Title 8 regulations did not "require PPE to help prevent the transmission of COVID-19" or "specifically require measures to ensure that employees are able to maintain personal hygiene, such as allowing time for employee handwashing, and the provision of hand sanitizer by the employer." The FOE noted workers continued to be infected with COVID-19, including COVID-19 outbreaks in approximately 400 workplaces. It further discussed the specific challenge posed by COVID-19 because infected individuals may be asymptomatic, yet able to transmit the disease to others. The FOE explained additional regulations would "reduce the number of COVID-19 infections in the workplace" by requiring employers "to implement multiple methods of protections from exposure to COVID-19 at its workplace."

Undoubtedly, existing Title 8 regulations required employers to take steps to protect workers against COVID-19, and Cal/OSHA was conducting inspections pursuant to those regulations. But despite those efforts, the FOE indicates employees continued to be exposed to, and test positive for, COVID-19. The FOE also explained current regulations were "not sufficiently specific as to what employers are required to do during the COVID-19 pandemic. This results in confusion on behalf of both employers and

employees, leaving many employees unprotected." The FOE thus explained further regulation was needed to control the spread of COVID-19.[8]

Next, appellants assert the FOE impermissibly relies on "convenience-based justifications," prohibited speculation, and unsubstantiated conclusions. We disagree. For example, FOE findings that the Board must implement COVID-19 specific regulations in place of general regulations in order to "preserve worker safety and health" is not a mere issue of "convenience." Similarly, the FOE findings regarding the spread of COVID-19 in the workplace are not "prohibited speculation and unsubstantiated conclusions." The FOE cites technical studies and reports addressing, for example, COVID-19 spread at a meat processing plant, farmworker housing outbreaks, transmission in a skilled nursing facility, and ventilation assessments relating to industrial and nonmedical settings. The FOE also identifies specific instances of workplace outbreaks. Moreover, as explained above, the FOE provides specific facts demonstrating the COVID-19 pandemic constituted an emergency under section 11346.1, subdivision (b)(2).

The record certainly contains conflicting evidence regarding the sufficiency of the Title 8 regulations. As appellants note, the Board staff report recommends against adopting the ETS. That report noted it was unaware of instances of noncompliance by the majority of workplaces, and a new regulation could burden employers and may not be an effective approach to the pandemic. Conversely, Cal/OSHA submitted a report recommending adoption of the ETS. Cal/OSHA's report explained, "There is no existing

_____

[8] We agree with respondents that Cal/OSHA's decision to cite while not assessing monetary penalties for violations of the ETS is irrelevant to the question of whether there was a need for immediate action. Appellants fail to draw a connection between the need for emergency regulations and assessing monetary fines pursuant to those regulations.

Title 8 regulation that comprehensively addresses an employer's responsibility to protect Non-[Regulation] 5199 Workers from infectious diseases." It explained none of the existing standards are specific to infectious disease or identify the specific measures that must be taken to fight the spread of an infectious disease. The report concluded Cal/OSHA's enforcement efforts would be strengthened through regulatory mandates specific to preventing the spread of infectious disease. Considering the record as a whole, substantial evidence supports the Board's determination that existing Title 8 regulations were insufficient to fully protect workers from COVID-19. And those findings provide sufficient support to justify the FOE.[9]

### b. Whether delay in enacting the ETS requires invalidation

Appellants next argue the Board was aware of the Governor's executive orders and the risk of COVID-19 as of March 2020, yet failed to act until November 2020. They assert the FOE omits any facts explaining why the Board was unable to act through nonemergency regulations during this period.

Section 11346.1, subdivision (b)(2) requires a finding of emergency to include "facts explaining the failure to address the situation through

---

[9] Appellants also criticize the trial court's decision as "making its own findings based on evidence outside the administrative record that was not considered by the Board." But it does not specifically identify what evidence the court improperly considered. Rather, the trial court emphasized the fatuousness of appellants' argument that workplaces have not been shown to be a vector for the spread of COVID-19, and cited recent case law noting how "any activity that brings individuals together increases the risk of additional infections." To the extent the trial court considered recently submitted reports from local health departments that were not before the Board, it explained those were considered solely when assessing the balance of interim harms.

nonemergency regulations" if the identified situation "existed and was known by the agency adopting the emergency regulation in sufficient time to have been addressed through nonemergency regulations."  The phrase "existed and was known" is not defined.  However, whether an emergency "existed and was known" to an agency is a factual inquiry that, in the context of a global pandemic, presents unique circumstances.  While COVID-19 existed and was known as of March 2020, the scope of the pandemic was still developing.  Appellants fail to explain how the Board could have anticipated the changing scientific advice on managing the pandemic, the insufficiency of existing regulations, the ongoing increase in infections and deaths, and the reopening of workplaces during increasing COVID-19 rates.  The FOE identifies these issues in support of the ETS.  For example, it identifies the increasing numbers of COVID-19 infections and deaths in California.  Likewise, it notes as of September 2020, Cal/OSHA was aware of approximately 400 COVID-19 outbreaks in workplaces not covered by Regulation 5199.  Yet in October 2020, the majority of California workplaces were allowed to reopen.  Many of the technical studies and supporting materials relied upon by the Board in drafting the FOE had been published or updated during the summer and fall of 2020.  And, as noted by other courts, the pandemic has been "dynamic" and constantly evolving.  (See, e.g., *California Attorneys for Criminal Justice v. Newsom* (May 13, 2020, No. S261829) __ Cal.5th __ [2020 WL 2568388 at p. *2] [noting "dynamic nature of the pandemic"]; *South Bay United Pentecostal Church v. Newsom* (2020) ___ U.S. ___ [140 S.Ct. 1613] (conc. opn. of Roberts, C. J.) [noting question of restrictions on activities during pandemic is a "dynamic and fact-intensive matter"]; *Roman v. Wolf* (C.D.Cal. Oct. 15, 2020, No. ED CV 20-00768 TJH) 2020 WL 6107069, at p. *4 ["the state of the science surrounding the novel coronavirus and the resulting

COVID-19 disease has been dynamic and constantly evolving"].) In fact, even some comment letters in opposition to the FOE and ETS acknowledged that the understanding of COVID-19 and the most effective mechanisms to prevent transmission were evolving.

Here, appellants assert the Board was required to act no later than May 2020—before the majority of workplaces had even reopened—or waive their ability to act through emergency regulations. We do not believe the Board's authority in this situation is so limited.[10] The FOE contains sufficient facts demonstrating the scope of the COVID-19 pandemic and related scientific understanding was changing throughout the spring, summer, and fall of 2020. Moreover, we note the Board was not doing "nothing," as appellants suggest. During the summer, Cal/OSHA and the Board were evaluating the scope of existing regulations and issued various reports discussing whether additional regulations were needed.

Appellants cite *Chamber of Commerce v. United States DHS* (N.D.Cal. Dec. 1, 2020) 504 F.Supp.3d 1077 to argue an agency's inability to understand the magnitude of the COVID-19 pandemic does not constitute good cause for delay. In that case, however, the court reviewed changes to the " 'specialty occupation' " definition in connection with H-1B visas. (*Id.* at pp. 1083–1084.) In doing so, the court noted in part the issues addressed by the regulatory changes were not new, and similar changes had been discussed prior to the pandemic. (*Id.* at p. 1088.) Accordingly, the court declined to consider the defendants' delay in assessing the good cause

---

[10] Appellants argue other agencies were able to act earlier. But as each agency faced its own unique issues and challenges in connection with the pandemic, the mere fact other agencies engaged in emergency rulemaking at earlier stages does not automatically indicate the Board's rulemaking was untimely.

exception.  (*Ibid*.)  Here, the emergency regulations did not address an auxiliary issue, but directly addressed the COVID-19 pandemic.  The changes set forth in the FOE in response to the COVID-19 pandemic did not constitute longstanding issues under consideration because the pandemic did not exist.

We thus conclude the scope and impact of the COVID-19 pandemic did not exist and was not known by Board "in sufficient time to have been addressed through nonemergency regulations."[11]  (See § 11346.1, subd. (b)(2).)  Accordingly, the trial court did not abuse its discretion in concluding that appellants failed to demonstrate a likelihood of success as to the adequacy of the FOE.

### 2.  *The ETS*

Appellants contend the ETS contains various provisions that exceed the Board's statutory authority under the Labor Code and the APA.

Labor Code section 6300 sets forth the purpose of the California Occupational Safety and Health Act of 1973:  to assure "safe and healthful working conditions for all California working men and women by authorizing the enforcement of effective standards, assisting and encouraging employers to maintain safe and healthful working conditions, and by providing for research, information, education, training, and enforcement in the field of occupational safety and health."  Labor Code section 6306, subdivision (a) defines " 'Safe,' " " 'safety,' " and " 'health' " as "freedom from danger to the life, safety, or health of employees as the nature of the employment reasonably permits."

---

[11] Accordingly, we need not address appellants' arguments regarding the validity of the addendum, the adequacy of the addendum's findings, or whether the FOE can be supplemented with other findings from the administrative record or subject to judicial notice.

25

The Board has exclusive state authority to "adopt, amend or repeal occupational safety and health standards and orders." (Lab. Code, § 142.3, subd. (a)(1).) The Labor Code further grants Cal/OSHA power "over every employment and place of employment in this state . . . necessary adequately to enforce and administer all laws and lawful standards and orders, or special orders requiring such employment and place of employment to be safe, and requiring the protection of the life, safety, and health of every employee in such employment or place of employment." (*Id.*, § 6307.)

### a. Prescriptive versus performance standards[12]

Appellants first argue the Board violated the statutory mandate of Labor Code section 144.6 by creating prescriptive standards without considering whether goals could be achieved by performance standards.[13] We disagree.

Labor Code section 144.6 states: "In promulgating standards dealing with toxic materials or harmful physical agents, the board shall adopt that

---

[12] " 'Performance standard' means a regulation that describes an objective with the criteria stated for achieving the objective." (§ 11342.570.) " 'Prescriptive standard' means a regulation that specifies the sole means of compliance with a performance standard by specific actions, measurements, or other quantifiable means." (§ 11342.590.)

[13] Appellants contend this issue should be reviewed de novo. We independently review "whether defendants have exceeded the scope of authority delegated by the Legislature to them." (*Southern California Gas Co. v. South Coast Air Quality Management Dist.*, *supra*, 200 Cal.App.4th at p. 268.) Here, however, appellants do not argue the Board does not have authority to enact prescriptive standards. Rather, they assert the Board first should have considered performance standards. The question thus is whether the Board's decision to utilize prescriptive rather than performance standards was " ' " 'reasonably necessary to effectuate the purpose of the statute.' " ' " (*Yamaha, supra*, 19 Cal.4th at p. 11.) On this issue, " '[o]ur inquiry necessarily is confined to the question whether the classification is "arbitrary, capricious or [without] reasonable or rational basis." ' " (*Ibid.*)

standard which most adequately assures, to the extent feasible, that no employee will suffer material impairment of health or functional capacity . . . . Whenever practicable, the standard promulgated shall be expressed in terms of objective criteria and of the performance desired." Similarly, Government Code section 11340.1, subdivision (a) provides: "It is the intent of the Legislature that agencies shall actively seek to reduce the unnecessary regulatory burden on private individuals and entities by substituting performance standards for prescriptive standards wherever performance standards can be reasonably expected to be as effective and less burdensome, and that this substitution shall be considered during the course of the agency rulemaking process."

Neither Labor Code section 144.6 nor Government Code section 11340.1 require the Board to adopt performance standards. Rather, agencies are instructed to favor performance standards over prescriptive standards "[w]henever practicable,"—i.e., when they are "expected to be as effective."[14] (Lab. Code, § 144.6; Gov. Code, § 11340.1, subd. (a).) Here, the record indicates the Board considered performance standards, adopted them where appropriate, and rejected them where necessary. In consideration of the FOE and ETS, Cal/OSHA submitted an evaluation to the Board. That

---

[14] Labor Code section 142.3, subdivision (c) also envisions some prescriptive standards: "Where appropriate, these standards or orders shall also prescribe suitable protective equipment and control or technological procedures to be used in connection with these hazards and shall provide for monitoring or measuring employee exposure at such locations and intervals and in a manner as may be necessary for the protection of employees. In addition, where appropriate, the occupational safety or health standard or order shall prescribe the type and frequency of medical examinations or other tests which shall be made available, by the employer or at his or her cost, to employees exposed to such hazards in order to most effectively determine whether the health of such employee is adversely affected by this exposure."

27

evaluation explained the shortcomings with the performance standards set in the existing Title 8 regulations. Namely, they "are not specific to this virus and generally do not identify the particular measures or controls that employers must take to prevent workplace spread of COVID-19." Cal/OSHA recommended adopting the emergency regulations to "complement and augment the existing rules."

The Board likewise concluded the general performance standards in the existing Title 8 regulations were insufficient to adequately protect workers from COVID-19. The FOE notes, "other than those employees who are covered under [Regulation] 5199, there is currently no specific regulation that protects all workers from exposure to infectious diseases such as COVID-19." The FOE identified various shortcomings in the existing Title 8 regulations and stated, under those regulations, there have been "[c]lusters and outbreaks of COVID-19" in workplaces throughout California. The FOE then addressed the need and purpose for each new provision.

Moreover, we note certain provisions of the ETS do, in fact, utilize performance standards. For example, the section addressing identification and evaluation of COVID-19 hazards allows employers to "develop and implement a process for screening employees and for responding to employees with COVID-19 symptoms." (Cal. Code Regs., title 8, § 3205, subd. (c)(2)(B).) Other provisions likewise set performance standards. (See, e.g., Cal. Code Regs., title 8, § 3205, subd. (c)(2)(C) ["develop COVID-19 policies and procedures to respond effectively and immediately to individuals at the workplace who are a COVID-19 case"]; *id.*, subd. (c)(2)(E) ["employer shall evaluate how to maximize ventilation with outdoor air"]; *id.*, subd. (c)(2)(G) ["evaluate existing COVID-19 prevention controls at the workplace and the need for different or additional controls"]; *id.*, subd. (c)(4) ["Employers shall

implement effective policies and/or procedures for correcting unsafe or unhealthy conditions, work practices, policies and procedures in a timely manner"].)

While certain provisions are prescriptive, the FOE justifies the adoption of those provisions. For example, in connection with the subsection addressing face coverings, the FOE explains "[t]he subsection is necessary, as the use of face coverings is recommended to reduce the transmission of COVID-19," and cites guidance issued by CDPH. The FOE further explains current evidence regarding transmission of COVID-19 particles and discusses the need to protect workers from individuals who cannot, or are not, wearing face coverings.

The administrative record demonstrates the Board did not abuse its discretion in adopting prescriptive standards in the ETS. Rather, the record indicates the Board considered performance standards during the rulemaking process, including those existing in the Title 8 regulations, and concluded certain prescriptive standards were necessary to assure "to the extent feasible, that no employee will suffer material impairment of health or functional capacity." (See Lab. Code, § 144.6.) We cannot conclude there was no reasonable basis for the Board's decision.

### b. Worker exclusion with certain benefits

Next, appellants contend the Board exceeded its authority by requiring "without exception, that any worker with 'COVID-19 exposure' be excluded 'from the workplace' for ten days." Appellants assert this requirement creates an "irrebuttable presumption" that the exposed worker is infectious. Appellants further contend the mandated continuation of pay, benefits, and seniority during the time of any exclusion due to a workplace-related exposure exceeds the Board's authority.

29

The ETS does not presume exposed employees are infectious. Rather, the ETS acknowledges an exposed worker *may* be infectious and thus may constitute a workplace hazard. Moreover, we need not opine on whether the provision creates an irrebuttable presumption because, even assuming it does, the Board did not exceed its authority in enacting the ETS.

As noted by appellants, an irrebuttable presumption in a statute regulating the private economic sector can be unconstitutional, and thus violate due process, "if it is irrational, arbitrary or unreasonable." (*Griffiths v. Superior Court* (2002) 96 Cal.App.4th 757, 779.) "A conclusive presumption in such a statute is therefore valid where a rational connection exists between the fact proved and the ultimate fact presumed." (*Ibid.*)

Here, a rational connection exists between an employee's exposure and the fact that the employee may have contracted COVID-19, thus necessitating his or her exclusion from the workplace. A CDC information sheet, cited in the FOE, explains COVID-19 is most commonly spread "through close contact from person to person, including between people who are physically near each other." The CDC thus recommends isolation for individuals who are within six feet of a COVID-19 case for a total of 15 minutes or more. Likewise, the FOE explains, "Controlling the spread of COVID-19 is a challenge. A person who is infected with COVID-19 may have no obvious symptoms, or no symptoms at all, yet still be infectious to others." Accordingly, there is a rational connection between a COVID-19 exposure and a presumption that the exposed individual may have contracted COVID-19.

Nor do the provisions mandating that workers exposed to COVID-19 cases receive pay, benefits, and seniority while excluded from the workplace

30

exceed the Board's authority.[15]  As noted above, the Board has broad authority to "adopt, amend or repeal occupational safety and health standards and orders."  (Lab. Code, § 142.3, subd. (a)(1).)  It is entitled to enact those safety standards it deems necessary in order to keep employees free "from danger to [their] life, safety, or health" to the extent permitted by their employment.  (Lab. Code, § 6306, subd. (a).)  In the context of the COVID-19 pandemic, the ETS thus requires "employers to implement multiple methods of protection," such as "responding to COVID-19 exposures" and "excluding COVID-19 cases from the workplace."  The FOE explained, in connection with the regulations mandating exclusion from the workplace in defined circumstances, "it is important that employees who are COVID-19 cases or who had exposure to COVID-19 do not come to work.  Maintaining employees' earnings and benefits when they are excluded from the workplace is important in ensuring that employees will notify their employers if they test positive for COVID-19 or have an exposure to COVID-19, and stay away from the workplace during the high-risk exposure period when they may be infectious."  Excluding workers exposed to known COVID-19 cases thus operates to protect other workers from potential exposure to COVID-19.  Similarly, mandating pay, benefits, and seniority during periods of exclusion furthers the goals of encouraging employees to report positive COVID-19 cases and COVID-19 exposures, thus allowing employers to minimize possible additional exposures to other workers.  These goals all fall within the

---

[15] We note the July 2021 revisions to California Code of Regulations, title 8, section 3205 replaced the term "COVID-19 exposure" (former subd. (b)(3)) with " '[c]lose contact' " (current subd. (b)(1)).  However, the altered language is not materially different for the scope of issues raised by this appeal.  We thus use the terms interchangeably in this opinion.

Board's authority to assure "safe and healthful working conditions." (Lab. Code, § 6300.)

Appellants next challenge the exception allowing employers to avoid the mandated continuation of pay, benefits, and seniority during the exclusion period by demonstrating any exclusion was not related to a work-based COVID-19 exposure. Appellants assert an employee could be exposed "anywhere," making it impossible to prove exposure from a nonwork event. Appellants thus contend Cal/OSHA should bear the burden of proving a workplace exposure.

Section 3205, subdivision (c)(9) of title 8 of the California Code of Regulations governs when employees must be excluded from the workplace. Subdivisions (A) and (B) identify two categories of employees: those who contract COVID-19, i.e., "COVID-19 cases," and those who have been exposed to a COVID-19 case, i.e., "close contact." (Cal. Code Regs., tit. 8, § 3205, subd. (c)(9)(A), (B).) Under certain circumstances, these employees are entitled to pay, seniority, and other benefits during their period of exclusion from the workplace. However, the regulation creates an exception regarding the second category of excluded employees—i.e., those with COVID-19 exposure: "Subsection (c)(9)(C) does not apply where the employer demonstrates that the close contact is not work related." (Cal. Code Regs., tit. 8, § 3205, subd. (c)(9)(C), Exception 2.)

There is no ambiguity regarding the source of a close contact or COVID-19 exposure. Close contact is defined as "being within six feet of a COVID-19 case for a cumulative total of 15 minutes or greater in any 24-hour period within or overlapping with the 'high-risk exposure period' defined by this section." (Cal. Code Regs., tit. 8, § 3205, subd. (b)(1).) " 'COVID-19 case' " is then defined as a person who "[h]as a positive 'COVID-19 test' as

32

defined in this section," "[h]as a positive COVID-19 diagnosis from a licensed health care provider," "[i]s subject to a COVID-19-related order to isolate issued by a local or state health official," or "[h]as died due to COVID-19, in the determination of a local health department." (*Id.*, subd. (b)(3).) If the individual qualifying as a "COVID-19 case" is not a coworker, then the exposure was not work related. Appellants fail to explain the ambiguity in this structure.

While appellants contend other exclusions and resulting continuations of pay and benefits require extensive review and involve hazards inherent to the work, they ignore the unique circumstances presented by the COVID-19 pandemic. Other regulations addressing workplace hazards involve worker exposure to toxic substances—not an infectious disease. There is no risk that the exposed worker may then be a hazard to his or her coworkers. Accordingly, those regulations involve various analyses not applicable here, such as whether the employee could be transferred to other work. (See, e.g., Cal. Code Regs., tit. 8, § 5197, subd. (i)(1).) Here, however, a worker exposed to COVID-19 becomes a new workplace hazard due to the nature of the virus. And guidance from the CDC and the CDPH instruct that individuals exposed to COVID-19 should quarantine. The more limited review in the case of COVID-19 exposure is thus reasonable in light of the unique nature of the pandemic.[16] Accordingly, the Board did not abuse its discretion in establishing regulations excluding workers exposed to COVID-19 cases from

---

[16] Appellants also seem to assert exclusions and mandated pay, benefits, and seniority must be connected to a hazard inherent in the workplace, and COVID-19 is not such a hazard. To the contrary, COVID-19 *is*—at least currently—a hazard inherent in the workplace. Due to the scope of the pandemic, COVID-19 poses a risk to any worker who is required to work in person and in proximity to others.

the workplace and mandating a continuation of pay, benefits, and seniority during such periods of exclusion.

## D.  *Balancing the Harms*

A trial court's decision on a motion for a preliminary injunction " 'does not amount to an adjudication of the ultimate rights in controversy.  It merely determines that the court, balancing the respective equities of the parties, concludes that, pending a trial on the merits, the defendant should or that he should not be restrained from exercising the right claimed by him [or her].'  [Citations.]  The general purpose of such an injunction is the preservation of the status quo until a final determination of the merits of the action.  [Citations.]  Thus, the court examines all of the material before it in order to consider 'whether a greater injury will result to the defendant from granting the injunction than to the plaintiff from refusing it; . . .'  [Citations.]  In making that determination the court will consider the probability of the plaintiff's ultimately prevailing in the case and, it has been said, will deny a preliminary injunction unless there is a reasonable probability that plaintiff will be successful in the assertion of his rights.  [Citations.] . . . 'In the last analysis the trial court must determine which party is the more likely to be injured by the exercise of its discretion [citation] and it must then be exercised in favor of that party.' "  (*Continental Baking Co. v. Katz* (1968) 68 Cal.2d 512, 528.)

Neither appellants' opening nor reply brief raises any argument with respect to the balancing of harms.  "An appellant's failure to raise an argument in its opening brief waives the issue on appeal."[17]  (*Dieckmeyer v.*

---

[17] While appellants filed a declaration from David Scaroni, a partner at Fresh Harvest, and a declaration from Carmen A. Ponce, the vice president and general counsel, labor for Tanimura & Antle Fresh Foods, Inc. at the same time they filed their opening brief, their opening brief makes no

*Redevelopment Agency of Huntington Beach* (2005) 127 Cal.App.4th 248, 260.)
Conversely, the Board argues "COVID-19 presented a serious and imminent
threat of harm" and it adopted the FOE and ETS based on that risk of harm
and after "interpreting complex scientific studies and public safety and
health guidance related to COVID-19 transmission; analyzing the protections
and coverage gaps in the existing safety and health regulatory scheme
protecting workers against exposure to airborne pathogens; and calculating
the most effective way to protect workers from the danger of having to report
to work in person during a dangerous pandemic."  Appellants thus have not
demonstrated the trial court erred in concluding the balance of harms
weighed in favor of respondents.

### III.  DISPOSITION

The trial court's order denying appellants' motion for preliminary
injunction is affirmed.  Respondents may recover their costs on appeal.  (Cal.
Rules of Court, rule 8.278(a)(1), (2).)

---

mention of the declarations and does not raise any argument as to them.  A
brief was also filed by NFIB Small Business Legal Center as amicus curiae.
That brief argues in part certain provisions of the ETS could deprive small
businesses of their labor force, the testing requirements are financially
ruinous, and the recordkeeping requirements impose onerous regulatory
obstacles.  These issues go toward the potential harm caused by the ETS.
However, California courts generally refuse to consider arguments raised by
amicus curiae when those arguments are not urged by the parties on appeal.
" ' "Amicus curiae must accept the issues made and propositions urged by the
appealing parties, and any additional questions presented in a brief filed by
an amicus curie will not be considered." ' "  (*California Assn. for Safety
Education v. Brown* (1994) 30 Cal.App.4th 1264, 1275.)  As noted above,
appellants have not argued the balance of harm weighs in their favor.

MARGULIES, J.

WE CONCUR:

HUMES, P. J.

SANCHEZ, J.

A162343
*Western Growers Association v. California Occupational Safety and Health Standards Board*

36

Filed 1/12/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| WESTERN GROWERS ASSOCIATION et al.,<br><br>      Plaintiffs and Appellants,<br><br>v.<br><br>OCCUPATIONAL SAFETY AND HEALTH STANDARDS BOARD et al.,<br><br>      Defendants and Respondents. | A162343<br><br>(San Francisco City & County<br> Super. Ct. No. CPF21517344) |

THE COURT:

         The opinion in the above-entitled matter filed on December 21, 2021, was not certified for publication in the Official Reports.  After the court's review of a request under California Rules of Court, rule 8.1120, and good cause established under rule 8.1105, it is hereby ordered that the opinion should be published in the Official Reports.

         There is no change in the judgment.

Dated:

                                                    _____
                                                    Margulies, Acting P.J.

Trial Court:  San Francisco City and County Superior Court

Trial Judge:  Hon. Ethan P. Shulman

Counsel:

Sheppard, Mullin, Richter & Hampton, David A. Schwarz, Kent R. Raygor, Barbara Taylor, Matthew T. Lin and Zachary J. Golda for Plaintiffs and Appellants.

NFIB Small Business Legal Center, Inc., Karen R. Harned, Rob Smith; Benbrook Law Group, PC, Bradley A. Benbrook and Stephen M. Duvernay for National Federation of Independent Business Small Business Legal Center, as Amicus Curiae on behalf of Plaintiffs and Appellants.

Rob Bonta, Attorney General, Michael L. Newman, Assistant Attorney General, James F. Zahradka, II, Lisa Cisneros, Vilma Palma-Solana, Anthony V. Seferian, James E. Stanley and William H. Downer, Deputy Attorneys General for Defendants and Respondents.

Altshuler Berzon, Stacey M. Leyton, Barbara J. Chisholm and Stefanie L. Wilson for Service Employees International Union, SEIU California State Council, United Farm Workers of America, International Brotherhood of Teamsters, United Food and Commercial Workers Union Western States Council, California Teachers Association, California School Employees Association, California Federation of Teachers, California Federation of Interpreters Local 39000 TNG-CWA, SMART-Transportation Division California State Legislative Board, and the California Labor Federation, as Amicus Curiae on behalf of Defendants and Respondents.

Impact Fund, Lindsay Nako, David S. Nahmias and Andrea A. Núñez for Impact Fund, California Rural Legal Assistance, Inc., Asian Americans Advancing Justice|Los Angeles, Bet Tzedek, Centro Legal de la Raza, California Rural Legal Assistance Foundation, Disability Rights California, Disability Rights Education & Defense Fund, Labor & Employment Committee of the National Lawyers Guild, Lawyers' Committee for Civil Rights of the San Francisco Bay Area, Legal Aid at Work, Legal Aid of Marin, Legal Services of Northern California, National Employment Law Project, Occupational Safety & Health Law Project, Public Counsel, Public Interest Law Project, San Diego Volunteer Lawyer Program, Western Center on Law

2

& Poverty, and Worksafe, Inc., as Amicus Curiae on behalf of Defendants and Respondents.